(167 P.3d 370)
No. 96,422

STATE OF KANSAS, *Appellee*, v. DARRELL J. BRANSON, *Appellant*.

Opinion filed September 21, 2007.

*Juanita M. Carlson*, of Carlson Law Office, P.A., of Lawrence, for the appellant.

*Brenda Clary* and *Deborah L. Moody*, assistant district attorneys, *Charles Branson*, district attorney, and *Phill Kline*, attorney general, for the appellee.

Before CAPLINGER, P.J., ELLIOTT, J., and BUKATY, S.J.

BUKATY, J.: Darrell J. Branson appeals his conviction following a bench trial for violation of a protective order. He essentially argues that the victim consented to his contact with her and this constitutes a defense to the charge. We affirm, finding that consent is not a defense to a charge of violation of a protective order.

The State charged Branson with violating "a protection from abuse order issued pursuant to K.S.A. 60-3105, K.S.A. 60-3106, [and] K.S.A. 60-3107 . . . in violation of K.S.A. 21-3843(a)(1)." It alleged the crime occurred on or about October 18, 2005. Among the witnesses listed was Pamela Hird.

Almost 4 months before the events leading to the charge, Hird had obtained a protection from abuse (PFA) order against Branson under the provisions of K.S.A. 60-3101 *et seq.* Authorities served Branson with the order shortly after its issuance.

The PFA order prohibited Branson from having any contact with Hird "except as authorized by the Court in this Order." It provided

that Branson "shall not enter or come on or around the premises or the residence or workplace where [Hird] resides, stays or works." An exception, not applicable here, allowed Branson to obtain his personal property from Hird's home one time while accompanied by a law enforcement officer.

By its terms, the order expired at midnight on June 27, 2006. It further warned:

"THE DEFENDANT IS HEREBY PUT ON NOTICE THAT VIOLATION OF THIS ORDER MAY CONSTITUTE VIOLATION OF A PROTECTIVE ORDER AS PROVIDED IN K.S.A. 21-3843 . . . AND MAY RESULT IN PROSECUTION AND CONVICTION UNDER KANSAS CRIMINAL STATUTES. VIOLATION OF THIS ORDER MAY ALSO BE PUNISHABLE AS A CONTEMPT OF THIS COURT."

At trial, Hird testified that on the evening in question, she was at home. She received a telephone call from an employee of a business that Hird owned stating that Branson had appeared at the business. The employee apparently knew of the PFA order and did not admit Branson to the business. The employee saw Branson leave in Hird's vehicle and then reported the information to police before telephoning Hird.

The police soon contacted Hird, who confirmed the existence of the PFA order. The police stopped Branson in Hird's vehicle. Branson denied that he was at Hird's business, but he admitted to taking the vehicle from Hird's residence. He apparently had taken the keys from a table in Hird's house.

Hird then testified about contact she had with Branson prior to the night in question. She said she had seen him either that morning or the prior evening. She admitted that Branson had been staying in her basement for a week or more, and that she had meals with Branson during the 2 days before his arrest. She explained that he was in the basement most of the time and would sometimes come upstairs. The basement has a separate apartment with an outside entrance. She maintained, nevertheless, that he was staying with her and using her vehicle without her permission. She also admitted that Branson had repaired a toilet and had worked on one of the garbage disposals.

Hird explained that she failed to report these violations of the PFA order to the police because:

"I thought that a protection order applied to both of us that if—that I was not supposed to have contact with him or allow him anywhere around me, and since I had not called the police immediately, that I would be in as much trouble as he was, and when he came—when he showed up, I think one of my biggest problems has always been to feel sorry for him when he is intoxicated and has no place to go, and I just couldn't see making him leave when he was that drunk. He was going to be passed out in the yard. It's gotten to be a joke I think in the neighborhood how many times I have called the police, and I was just tired of it."

After the State rested, defense counsel moved to dismiss the charges based on Hird's allowing Branson to stay on the property and not contacting police. The district court denied the motion, stating that Hird's acquiescence was not a defense to the charge of violating the court order. The defense presented no evidence. The district court then ruled as follows:

"Well, based on the testimony, I do find that Mr. Branson has violated the protection order and I certainly understand the defense's position in this matter. Miss Hird's acquiescence in this certainly doesn't help the situation, but he has clearly violated the order, so I will find he is guilty."

The district court made no further findings pertaining to the guilt issue. It then sentenced Branson to 12 months in the county jail and costs.

Branson first argues on appeal that consent is a defense to criminal violation of a protective order. He does not distinguish between consent and acquiescence but uses the terms interchangeably. While the terms are similar, they are not interchangeable in some areas of criminal law. See *Bumper v. North Carolina,* 391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968) (consent to search requires more than "acquiescence to a claim of lawful authority"); *State v. Jones,* 279 Kan. 71, 78, 106 P.3d 1 (2005) (defendant's "mere acquiescence" to a search "does not establish voluntary consent"). In our analysis of the issue we deem it unnecessary to distinguish between the terms. For the sake of simplicity, we will refer only to consent.

We first note that nowhere in the statute defining the crime, K.S.A. 2005 Supp. 21-3843, is consent mentioned at all. Therefore,

if consent is deemed to be a defense, it must find its basis in a source apart from the statute defining the crime. Such a defense has been described as a situation where "assuming" facts alleged in the charging instrument are true, . . . if the affirmative defense is found to be factually true . . . , the defendant should be found not guilty." *State v. McIver*, 257 Kan. 420, 431, 902 P.2d 982 (1995). Whether an affirmative defense exists is a question of law subject to unlimited review. See *City of Wichita v. Tilson*, 253 Kan. 285, 291, 855 P.2d 911, *cert. denied* 510 U.S. 976 (1993).

The district court's ruling suggests that one of its rationales for denying a consent defense was the derogation of the court's authority. The judge stated his rationale quite simply: "[Branson] has clearly violated the order, so I will find he is guilty." The State similarly argues on appeal: "[T]here is absolutely no precedent for suspending or nullifying a court order except by seeking a further order of the court." This certainly is a factor worthy of consideration even though the Protection From Abuse (PFA) Act provides a proper remedy for any derogation of the district court's authority in its provisions allowing criminal contempt proceedings for violation of PFA orders. K.S.A. 60-3110.

In addition to this consideration, however, is consideration of the nature of a criminal act in general as set forth in Kansas statutes and case decisions. A criminal act occurs "against the peace and dignity of the State of Kansas," as was stated in the charging document involved here. Also, "the philosophy of this state has always been that a criminal prosecution is a state affair." *State ex rel. Rome v. Fountain*, 234 Kan. 943, 945, 678 P.2d 146 (1984). The current Kansas Criminal Code begins by defining its scope as "conduct [which] constitutes a crime against the state of Kansas." K.S.A. 21-3102(1). Of further significance in this regard is the chapter of the state criminal code where the crime involved here is found. It is in Article 38, titled "Crimes Affecting Governmental Functions."

The facts here particularly indicate why Branson's actions implicate the State and the public at large. Hird testified that she had essentially given up because of public embarrassment and her feelings of pity for Branson. At sentencing, the State referred to an earlier conviction "in 05 CR 925 . . . of violating the same pro-

tective order." The State asserted that Branson was on probation in that case under the condition that he have no contact of any kind with Hird. The trial judge noted that Branson had been before him several times in connection with his lengthy, antagonistic relationship with Hird over the past years.

Such longstanding and intractable conflicts implicate more than a victim's own wishes or even the court's authority. Also, the legislature is presumed to have expressed its intent through the language of the statute, *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006). Its decision to criminalize a violation of a PFA order reflects a concern for the public peace. Persons granted a PFA order have already proven "the allegation of abuse by a preponderance of the evidence" on a prior occasion. K.S.A. 60-3106(a). Nothing in the language of K.S.A. 2005 Supp. 21-3843 suggests a legislative intent to excuse an abuser just because the victim later consents to contact in violation of the PFA order. See *Bryan*, 281 Kan. at 159 ("A statute should not be read to add language that is not found in it . . . ."). The legislature saw fit to provide for court supervision over the parties, and that supervision continues until the PFA order is modified or dismissed. See K.S.A. 60-3107(e), (f). In context, then, we deem Branson's act here that was contrary to the court's supervision to be of sufficient threat to the public peace that the act is criminal regardless of consent.

Our ruling does not construe the statute against Branson, as he suggests on appeal. It simply acknowledges the plain language of its provisions. The cases he cites on appeal are also not persuasive. The affirmative defense raised in *State v. Strane*, 61 P.3d 1284, 1288-90 (Alaska 2003), involved a mistake of law, not consent. In *State v. Dejarlais*, 136 Wash. 2d 939, 969 P.2d 90 (1998), the Washington Supreme Court found consent was not a defense even though the statutes in effect on the date of the crime did not explicitly exclude that defense. The Washington court held the purpose of the domestic violence statutes ruled out a consent defense, and that a later amendment making this clear merely showed the already-existing legislative intent. 136 Wash. 2d at 944-45.

Branson cites no authority that renders consent an affirmative defense to a charge of violation of a protective order in Kansas,

and our research reveals none. It is left to the legislature then, if it desires, to provide that a victim's consent to contact by his or her former abuser will relieve the abuser of criminal responsibility. The trial court did not err in refusing to consider a consent defense in this case.

Branson also argues on appeal that the evidence at trial supported his defense of consent. Obviously, in light of our ruling above, the issue is moot. Branson never disputed the validity of the PFA order involved, nor did he dispute the significant facts testified to by Hird as to his contact with her. We find no error.

Affirmed.